SYLLABUS

This syllabus is not part of the Court's opinion.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**State v. Calvin Fair** (A-20-22) (086617)

**Argued September 12, 2023 -- Decided January 16, 2024**

**WAINER APTER, J., writing for a unanimous Court.**

The Court considers whether a prosecution for terroristic threats under N.J.S.A. 2C:12-3(a) premised on a mens rea of recklessness is constitutional.

In February 2015, State Police seized several handguns from defendant Calvin Fair's home.  In April 2015, defendant referenced the search on Facebook, noting that none of the guns the police found were his and that he still had all of his guns.

On May 1, 2015, officers responded to a domestic-violence call at defendant's home.  After a few verbal exchanges with an officer, defendant yelled:  "Worry about a head shot, [epithet]."  At no point did defendant brandish a weapon.  About two hours after the officers left, defendant made Facebook posts stating in part, "THN YU GOT THESE . . . OFFI$ERS THINKIN THEY KNO UR LIFE!!! . . . .  I KNO WHT YU DRIVE & WHERE ALL YU MOTHERFU$KERS LIVE AT[.]"

After reviewing the public posts, police issued a terroristic threats complaint against defendant.  An officer testified that in addition to the "[w]orry about a head shot" comment, he was concerned from the Facebook posts that defendant still had his guns and knew where the officers lived and what cars they drove.

The terroristic threats statute, N.J.S.A. 2C:12-3, has two subsections.  Subsection (a) provides that "[a] person is guilty of a crime of the third degree if he threatens to commit any crime of violence with the purpose to terrorize another . . . or in reckless disregard of the risk of causing such terror."  (emphasis added).  Subsection (b) applies to threats to kill another.  Defendant was indicted for actions "contrary to the provisions of N.J.S.A. 2C:12-3a and/or b."

Defendant moved to dismiss the indictment, arguing, among other things, that N.J.S.A. 2C:12-3(a) is unconstitutionally overbroad because it criminalizes terroristic threats made with a mens rea of recklessness.  At trial, the State asked that the court charge the jury on N.J.S.A. 2C:12-3(a) and/or (b).  And the verdict sheet mirrored the indictment, directing the jury to determine whether the State had

1

proven beyond a reasonable doubt that defendant committed third-degree terroristic threats in violation of N.J.S.A. 2C:12-3(a) and/or (b).  During deliberations, the jury sent a note, asking:  "Do both 2C:12-3(a) and 2C:12-3(b) have to be proven beyond a reasonable doubt or just one or the other?"  With the consent of both parties, the court responded that "it could be . . . one or the other."  Twenty minutes later, the jury reached a guilty verdict.

Defendant appealed, and the Appellate Division reversed, agreeing with defendant both that the "reckless disregard" portion of N.J.S.A. 2C:12-3(a) is "facially invalid" and that, "[w]ithout an instruction that would have made . . . clear to the jury" that they needed to be unanimous on whether defendant violated N.J.S.A. 2C:12-3(a), (b), or both, "we can have no confidence that the jury did not produce an impermissibly fragmented verdict."  469 N.J. Super. 538, 548, 558 (App. Div. 2021).  The State appealed as of right pursuant to Rule 2:2-1(a)(1).

**HELD:**  A mental state of recklessness -- defined in this context as "morally culpable conduct, involving a 'deliberate decision to endanger another,'" Counterman v. Colorado, 600 U.S. 66, 79 (2023) -- is constitutionally sufficient for a "true threats" prosecution under N.J.S.A. 2C:12-3(a).  An objective component is also necessary for a "true threats" prosecution to survive constitutional scrutiny:  the State must prove that a reasonable person similarly situated to the victim would have viewed the message as threatening violence.  Here, defendant was charged with terroristic threats in violation of N.J.S.A. 2C:12-3(a) and/or (b).  On remand, the jury should be charged that they must unanimously agree as to whether defendant violated N.J.S.A. 2C:12-3(a), (b), or both.

1.  The Court reviews the doctrine of "true threats" -- which "lie outside the bounds of the First Amendment's protection," Counterman, 600 U.S. at 72 -- as developed through Supreme Court jurisprudence.  The Court substantially adopts the Counterman standard and holds that in a criminal prosecution for a true threat of violence under N.J.S.A. 2C:12-3(a), a mens rea of recklessness suffices for purposes of the First Amendment to the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution.  Under this standard, to be found guilty of a violation of N.J.S.A. 2C:12-3(a), a defendant must have consciously disregarded a substantial and unjustifiable risk that their threat to commit a crime of violence would terrorize another person, and that conscious disregard must be a gross deviation from the standard of conduct that a reasonable person in a defendant's situation would observe.  In the context of true threats, a mens rea of recklessness is demanding:  it "means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'"  Id. at 79.  Although it is not purposeful or knowing, "recklessness is morally culpable conduct, involving a 'deliberate decision to endanger another.'"  Ibid.  This understanding of recklessness requires more than the standard of recklessness conveyed in the judge's

2

instructions to the jury in this case, which provided in part that "[o]ne is said to act recklessly if one acts . . . heedlessly, or foolhardily." (emphasis added). With this understanding of recklessness as "morally culpable conduct" in the context of true threats, the Court agrees that it is constitutionally sufficient for a prosecution of a threat of violence under N.J.S.A. 2C:12-3(a). The Court does not decide whether a different intent requirement should apply to prosecutions for dissenting political speech, because no such speech was prosecuted here. (pp. 16-29)

2. In addition to a subjective mens rea of at least recklessness, an objective component is necessary for a prosecution for a threat of violence under N.J.S.A. 2C:12-3(a) to survive First Amendment and Article I, Paragraph 6 scrutiny. On the objective element, the Court departs from Counterman and from the charge that the trial court provided to the jury in this case in one minor respect: the objective inquiry, in which the jury determines whether a reasonable person would have viewed the defendant's words as threatening violence, must be undertaken not from the perspective of an anonymous ordinary person, but from the perspective of a reasonable person similarly situated to the victim. This is another way of saying that context matters. Considering the perspective of one similarly situated to the victim, which entails consideration of prior interactions between the parties, protects against convictions for statements made in jest, political dissent, or angry hyperbole, while allowing the State to prosecute true threats of violence that would instill fear of injury in a reasonable person in the victim's position. (pp. 29-32)

3. The Court remands for a new trial correctly charging the jury on both the objective and subjective components of N.J.S.A. 2C:12-3(a), consistent with this opinion. The Court also asks the Model Criminal Jury Charges Committee to revise the model charge for N.J.S.A. 2C:12-3(a), as to both the subjective recklessness standard -- including by removing the terms "heedlessly" and "foolhardily" -- and the objective standard discussed in its opinion. (pp. 32-33)

4. Jurors must unanimously agree that the defendant committed every element of the crime with which he is charged, beyond a reasonable doubt. On remand, the court should additionally charge the jury that it must agree unanimously on whether defendant violated N.J.S.A. 2C:12-3(a), (b), or both. The terroristic threats statute does not identify an individual element of which subsections (a) and (b) are mere examples, but rather lists in the disjunctive two separately enumerated, alternative crimes of terroristic threats. (pp. 22-23, 33-35)

**AFFIRMED in part, REVERSED in part. REMANDED to the trial court.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, FASCIALE, and NORIEGA join in JUSTICE WAINER APTER's opinion.**

3

SUPREME COURT OF NEW JERSEY

A-20 September Term 2022

086617

State of New Jersey,

Plaintiff-Appellant,

v.

Calvin Fair,

Defendant-Respondent.

On appeal from the Superior Court,
Appellate Division, whose opinion is reported at
469 N.J. Super. 538 (App. Div. 2021).

| Argued | Decided |
| --- | --- |
| September 12, 2023 | January 16, 2024 |

Alecia Woodard, Assistant Prosecutor, argued the cause
for appellant (Raymond S. Santiago, Monmouth County
Prosecutor, attorney; Daniel I. Bornstein, Designated
Counsel, of counsel and on the briefs).

Daniel S. Rockoff, Assistant Deputy Public Defender,
argued the cause for respondent (Joseph E. Krakora,
Public Defender, attorney; Daniel S. Rockoff, of counsel
and on the briefs).

Michael L. Zuckerman, Deputy Solicitor General, argued
the cause for amicus curiae Attorney General of New
Jersey (Matthew J. Platkin, Attorney General, attorney;
Jeremy M. Feigenbaum, Solicitor General, Michael L.
Zuckerman, David M. Galemba, Tim Sheehan, and Catlin

A. Davis, Deputy Attorneys General, of counsel and on the briefs).

Alexander Shalom argued the cause for amicus curiae American Civil Liberties Union of New Jersey (American Civil Liberties Union of New Jersey Foundation and Rutgers Constitutional Rights Clinic Center for Law & Justice, attorneys; Alexander Shalom and Jeanne LoCicero, of counsel and on the briefs, and Ronald K. Chen, on the briefs).

Bruce S. Rosen argued the cause for amicus curiae Association of Criminal Defense Lawyers of New Jersey (Pashman Stein Walder Hayden, attorneys; CJ Griffin, of counsel and on the briefs, and Bruce S. Rosen and Dillon J. McGuire, on the briefs).

JUSTICE WAINER APTER delivered the opinion of the Court.

This case requires us to decide whether a prosecution for terroristic threats under N.J.S.A. 2C:12-3(a) premised on a mens rea of recklessness is constitutional under the First Amendment to the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution. N.J.S.A. 2C:12-3(a) provides that a person is guilty of third-degree terroristic threats "if he threatens to commit any crime of violence with the purpose to terrorize another or . . . in reckless disregard of the risk of causing such terror or inconvenience."

2

Defining recklessness in this context as "morally culpable conduct, involving a 'deliberate decision to endanger another,'" Counterman v. Colorado, 600 U.S. 66, 79 (2023) (quoting Voisine v. United States, 579 U.S. 686, 694 (2016)), we hold that a mental state of recklessness is constitutionally sufficient for a "true threats" prosecution under N.J.S.A. 2C:12-3(a). We also hold that an objective component is necessary for a "true threats" prosecution to survive constitutional scrutiny: the State must prove that a reasonable person similarly situated to the victim would have viewed the message as threatening violence.

Finally, defendant Calvin Fair was charged with terroristic threats in violation of N.J.S.A. 2C:12-3(a) and/or (b). We agree with the Appellate Division that on remand, the jury should be charged that they must unanimously agree as to whether defendant violated N.J.S.A. 2C:12-3(a), (b), or both.

We thus affirm in part and reverse in part the judgment of the Appellate Division and remand for a new trial consistent with this opinion.

3

I.

A.

In February 2015, State Police executed a search warrant at the home defendant shared with his mother and tenants in Freehold. They seized several handguns. In April 2015, defendant referenced the search in three public Facebook posts or comments: (1) "And all thm hammers[1] they found inn my house! None of thm was mines, I still got all of mines lol"; (2) "This is a post for, Freehold Boro poli$e, . . . keep wall wat$hin ur not gonna get my life from fb"; (3) "I hope they burn freehold down!!! . . . & yu if look my way again, im joinin ISIS. Lol."

On May 1, 2015, three Freehold Borough Police Department officers, including Officer Sean Healey, responded to a 911 domestic-violence call at defendant's home. Healey knew defendant and was aware that firearms had been recovered during the February raid.

When police arrived, they saw defendant's girlfriend L.W. outside with her children and some of her belongings. She told police that she had been "thrown out of the house" but wanted to retrieve her television, which was still

_____

[1] "Hammers" is a commonly used slang term for guns.

4

inside. Officers repeatedly knocked on the door, trying to speak to defendant to get the TV returned. Defendant did not answer.

L.W. stated that she did not want to file a complaint or seek a restraining order against defendant. While the police were filling out a victim-notification form, defendant stuck his head out of a second-floor window and yelled: "Please. Just leave. Just leave this property. Because I don't want nothing -- I don't want to talk. There's nothing to talk about. All I did was put her stuff out and she can leave. . . . Please just leave. . . . You all causing too much chaos over here for nothing."

Police moved off defendant's front yard and onto the sidewalk. They asked defendant if he would return L.W.'s television. Defendant appeared to become more agitated, calling the situation "petty" and shouting, "[h]ow many times y'all been through this? How many times y'all came over here? . . . . Just leave my property. Just leave my property. I'm taking care of my mother." Officer Healey yelled, "[w]e're going to go. Have a good day, Calvin. Thank you for your cooperation."

Instead of leaving, Officer Healey told L.W. they were going to sign a complaint on her behalf "right now." L.W. said "Calvin, go in the house before you get in trouble," but defendant began yelling profanities at Officer Healey,

5

repeatedly calling him the "f---ing devil." When Officer Healey said, "[w]e'll be back with your warrant. . . . So, have fun," defendant shouted, "[y]ou talking crazy, [epithet], talking about signing a f---ing complaint. . . . Always trying to break somebody's a--. That's all you think about, breaking somebody's a--. Sign a complaint to what? I never did anything to you . . . . Absolutely nothing. I never did anything. . . . Get the f--- out of here, [epithet]." Healey responded, "That's disorderly conduct, too."

Defendant then yelled: "F---ing thirsty a-- [epithet]. You thirsty. Worry about a head shot, [epithet]." Officer Healey replied, "And that there is a threat." Another officer on the scene agreed, "That is threats right there." At no point did defendant brandish a weapon.

The officers then got in their cars and left.

Approximately two hours later, defendant posted the following on Facebook:

> I think its about tht time to give Mr. Al Sharpton & Mr Rev[] Jackson, internal affairs & my law[yer] a $all, one thg yu wont do is disrespe$t me or my 84 year old mother kause yu $arry a badge & another thg yu not doin is tryin to keep me inn system with patty fines & $omplaints whn im not ur job . . . . My 84 year old mother didnt deserves her door bein ki$k inn by 30 armed offi$ers with aks & shields drawn. . . . YU WILL PAY, WHOEVA HAD ANY INVOLVEMENT. WASTIN TAX PAYERS MONEY! BRINING ALL

6

THM OFFI$ERS OUT FOR A 84 YEAR OLD WOMEN! SO SAD BUT WE WILL HAVE THA LAST LAUGH! #JUSTWAITONIT[.]

Defendant then replied to his own post, "THN YU GOT THESE . . . OFFI$ERS THINKIN THEY KNO UR LIFE!!! . . . . I KNO WHT YU DRIVE & WHERE ALL YU MOTHERFU$KERS LIVE AT[.]"

After reviewing the public posts, police issued a terroristic threats complaint against defendant. Officer Healey testified that in addition to the "[w]orry about a head shot" comment, he was concerned from the Facebook posts that defendant still had his guns and knew where the officers lived and what cars they drove.

B.

The terroristic threats statute under which the police charged defendant reads, in relevant part:

> (a) A person is guilty of a crime of the third degree if he threatens to commit any crime of violence with the purpose to terrorize another . . . <u>or in reckless disregard of the risk of causing such terror</u> . . . .
>
> (b) A person is guilty of a crime of the third degree if he threatens to kill another with the purpose to put him in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out.

7

[N.J.S.A. 2C:12-3 (emphasis added).]

On August 13, 2015, a Monmouth County Grand Jury indicted defendant on one count of third-degree terroristic threats for

> threatening to commit a crime of violence with the purpose to terrorize [Officer Healey], or in reckless disregard of the risk of causing such terror, or by threatening to kill [Officer Healey], with the purpose to put him in imminent fear of death under circumstances reasonably causing [Officer Healey], to believe the immediacy of the threat and the likelihood that it would be carried out, contrary to the provisions of N.J.S.A. 2C:12-3a and/or b.

Defendant moved to dismiss the indictment, arguing, among other things, that N.J.S.A. 2C:12-3(a) is unconstitutionally overbroad because it criminalizes terroristic threats made with a mens rea of recklessness. The trial court denied the motion, finding defendant's statements, including the "worry about a head shot" comment and the subsequent Facebook post about knowing "what cars the officers drove and where they lived," were a true threat that was not protected by the First Amendment. The court also concluded that defendant's statements were "properly categorized as a threat to kill or to harm" Healey, and "were not political and were not made in a political context."

At trial, the State asked that the court charge the jury on N.J.S.A. 2C:12-3(a) and/or (b). Defendant did not object. The court charged the jury on N.J.S.A. 2C:12-3(a) as follows:

> The first element that the State must prove beyond a reasonable doubt is that defendant threatened to commit any crime of violence. The State alleges that defendant threatened to kill Patrolman Sean Healey.
>
> The words or actions of the defendant must be of such a nature as to convey menace or fear of a crime of violence to the ordinary person. It is not a violation of this statute if the threat expresses fleeting anger or was made merely to alarm.
>
> The second element the State must prove beyond a reasonable doubt is that the threat was made with the purpose to terrorize another or in reckless disregard of the risk of causing such terror. In this case, the State alleges the defendant intended to terrorize Sean Healey. The State need not prove the victim actually was terrorized.
>
> . . . .
>
> A person acts recklessly with respect to the result of his conduct if he consciously disregards a substantial and unjustifiable risk that the result will occur from his conduct. The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation. One is said to act recklessly if one acts with recklessness, with scorn for the consequences, heedlessly, or foolhardily.

9

The court then charged the jury on N.J.S.A. 2C:12-3(b), along with the lesser included offense of disorderly conduct. On unanimity, the court instructed: "The verdict must represent the considered judgment of each juror and must be unanimous as to each charge. This means you must all agree if the defendant is guilty or not guilty of the charge."

The verdict sheet mirrored the indictment, directing the jury to determine whether the State had proven beyond a reasonable doubt that defendant committed third-degree terroristic threats in violation of N.J.S.A. 2C:12-3(a) and/or (b):

> Defendant Calvin Fair did commit the crime of Terroristic Threats by threatening to commit a crime of violence with the purpose to terrorize Sean Healey, or in reckless disregard of the risk of causing such terror, or by threatening to kill Sean Healey with the purpose to put him in imminent fear of death under circumstances reasonably causing Sean Healey to believe the immediacy of the threat and the likelihood it would be carried out. With respect to this charge, how do you find?

Defendant did not object to any portion of the charge or verdict sheet.

During deliberations, the jury sent a note, asking: "Do both 2C:12-3(a) and 2C:12-3(b) have to be proven beyond a reasonable doubt or just one or the

10

other?"  With the consent of both parties, the court responded:  "the answer is it could be . . . one or the other . . . ."

Twenty minutes later, the jury reached a guilty verdict.  They were not polled as to whether they found defendant guilty of N.J.S.A. 2C:12-3(a), (b), or both.

Defendant was sentenced to three years in prison.

C.

Defendant appealed, arguing that the "reckless disregard" portion of N.J.S.A. 2C:12-3(a) is unconstitutionally overbroad and that the indictment, jury instructions, and verdict sheet were "'poorly structured,' making it '[im]possible to know whether the jury reached a . . . unanimous verdict.'"  State v. Fair, 469 N.J. Super. 538, 541 (App. Div. 2021) (alteration in original).

The Appellate Division reversed and remanded, agreeing with defendant that the "reckless disregard" portion of N.J.S.A. 2C:12-3(a) is "facially invalid."  Id. at 548.  According to the Appellate Division, in order to comply with the First Amendment, a prosecution for true threats "requires proof that a speaker specifically intended to terrorize."  Ibid.  The Appellate Division relied on the United States Supreme Court's statement in Virginia v. Black that "'[t]rue threats' encompass those statements where the speaker means to

communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." 538 U.S. 343, 359 (2003) (quoting Watts v. United States, 394 U.S. 705, 708 (1969)); Fair, 469 N.J. Super. at 550.

The court also agreed with defendant that "[w]ithout an instruction that would have made . . . clear to the jury" that they needed to be unanimous on whether defendant violated N.J.S.A. 2C:12-3(a), (b), or both, "we can have no confidence that the jury did not produce an impermissibly fragmented verdict." Fair, 469 N.J. Super. at 558. When the jury asked if both (a) and (b) had to be proven beyond a reasonable doubt, or if it could be just one or the other, "[t]he judge should have explained, for example, that a guilty verdict could not be rendered if only some of the jurors found a violation of subsection (a) but not (b), and the others found a violation of subsection (b) but not (a)." Id. at 556.

The Appellate Division therefore dismissed the portion of the indictment that charged defendant with acting "in reckless disregard of the risk of causing" terror under N.J.S.A. 2C:12-3(a) and remanded for a new trial on the remainder of the indictment. Id. at 558.

The State filed a notice of appeal as of right to this Court, pursuant to Rule 2:2-l(a)(l), based on a substantial question "arising under the Constitution

12

of the United States or this State." Defendant moved to dismiss the appeal. We denied defendant's motion to dismiss and ordered the appeal to proceed. We also granted leave to the Attorney General, the American Civil Liberties Union of New Jersey (ACLU), and the Association of Criminal Defense Lawyers of New Jersey (ACDL) to appear as amici curiae.

While the State's appeal was pending, the Supreme Court decided Counterman v. Colorado, which establishes the federal constitutional requirements for a true threats prosecution. 600 U.S. 66 (2023).

## II.

The State maintains that N.J.S.A. 2C:12-3(a) is constitutional because Counterman "clarified that true threats are not protected under the First Amendment if they are communicated with a mens rea of recklessness." According to the State, "[d]efendant was not prosecuted for expressing any so-called political opinions. He was prosecuted for threatening to shoot Officer Healey in the head." That threat was not protected by the First Amendment under Counterman, and this Court should not "afford greater protection to true threats under the New Jersey Constitution than that which is afforded under the First Amendment," the State contends. The State also argues that "[t]here was no need for a specific unanimity instruction as to the particular subsection of

13

the statute that was violated, or the particular factual predicate for a finding of guilt, especially in the absence of a request for either type of instruction."

The Attorney General agrees with the State that Counterman controls the First Amendment inquiry, and that there are no sound reasons to depart from that rule under the New Jersey Constitution. According to the Attorney General, defendant was not engaged in "political speech," and in any event, any rule varying the mens rea depending on whether the threat involved political speech would be both "unworkable" and unjustified in light of the speech-protective safeguards built into Counterman.

Defendant contends that Counterman did not resolve the First Amendment question in this case because while the speech in Counterman involved interpersonal stalking, defendant's statements amounted to "political dissent . . . about his government's criminal justice policies." According to defendant, because political speech has more First Amendment value than interpersonal harassment, it is "not too much to require the government to prove that a protesting speaker intended to make a threat before it can imprison its critic." Defendant further maintains that the "more protective" New Jersey Constitution should be interpreted more broadly than the First Amendment to require a specific intent to threaten. Defendant also asks us to affirm the

14

Appellate Division's "well-reasoned and unexceptionable application of the relevant case law" on unanimity. Because of the way the verdict sheet was phrased, according to defendant, it is impossible to know if all twelve jurors found him guilty of violating N.J.S.A. 2C:12-3(a), (b), or both.

The ACLU argues that there "can be no clearer example of political protest and advocacy" than defendant's speech in this case. It also contends that we should interpret our State Constitution to require "specific intent to place the victim in fear of bodily harm" in all true threats cases.

The ACDL agrees that our State Constitution "require[s] a higher mens rea than recklessness" in a prosecution for true threats. As a fallback, the ACDL advocates for "at [] least . . . a more exacting standard of recklessness." The ACDL also argues that a specific unanimity instruction was required here because N.J.S.A. 2C:12-3(a) and (b) "are not merely different means of committing the crime of terroristic threats, but separate theories of guilt based upon different acts and different evidence."

### III.

### A.

We review the constitutionality of a statute de novo, owing no deference to the Appellate Division in deciding a question of law. State v. Pomianek,

15

221 N.J. 66, 80 (2015).  Where the Supreme Court has pronounced the relevant standard under the United States Constitution, "we are bound to follow it as the minimal amount of constitutional protection to be provided."  State v. Adkins, 221 N.J. 300, 313 (2015).  The New Jersey Constitution may of course provide protections beyond the federal minimum.  See, e.g., State v. Schmid, 84 N.J. 535, 557 (1980).

B.

1.

The First Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that "Congress shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I; Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31, 585 U.S. ___, 138 S. Ct. 2448, 2463 (2018).

But "[t]rue threats of violence . . . lie outside the bounds of the First Amendment's protection."  Counterman, 600 U.S. at 72.  The canonical case setting forth the doctrine of "true threats" is Watts v. United States.  In Watts, the petitioner attended a rally on the Washington Monument grounds.  394 U.S. at 706.  During a small-group discussion about police brutality, the petitioner stated that he had received a draft classification of 1-A and was

16

supposed to report for a physical, but "'I am not going. If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.' 'They are not going to make me kill my black brothers.'" Ibid. The petitioner and the crowd then laughed. Id. at 707.

The petitioner was convicted of violating 18 U.S.C. § 871(a), which prohibited any person from "knowingly and willfully . . . [making] any threat to take the life of or to inflict bodily harm upon the President of the United States." Id. at 705 (alteration and omission in original). The Supreme Court held that the statute was "[c]ertainly . . . constitutional on its face" but reversed petitioner's conviction because he had not made any true threat to harm the President. Id. at 707. As the Court explained, a statute which criminalizes "a form of pure speech" must, consistent with the "commands of the First Amendment," distinguish between actual threats of violence and constitutionally protected speech. Ibid. Because petitioner's statement, "[t]aken in context," did not truly threaten to kill President Johnson and was instead only a "very crude offensive method of stating a political opposition to the President," the Supreme Court reversed the conviction. Id. at 708.

17

Under Watts, a person may be convicted of a true threat only if their speech, when taken in context, actually threatens violence. "[P]olitical hyperbole" is simply not a "true 'threat.'" Ibid.

In several subsequent decisions, the Supreme Court discussed, but did not definitively determine, what mens rea is required for a true threats prosecution under the First Amendment.

In Black, the Court explained that "'[t]rue threats' encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular" person or group of people. 538 U.S. at 359. The Court went on: "The speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats 'protects individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" Id. at 359-60 (quoting R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992)). Black struck down a portion of a Virginia statute that prohibited cross burning with "intent to intimidate a person or group of persons" and provided that any cross burning would itself "be prima facie evidence" of such intent. Id. at 347-48 (quoting Va. Code Ann. § 18.2-423). A plurality of the Court explained that the prima facie provision was

18

unconstitutional because it allowed the state to convict a defendant not only for a cross burned on a person's front yard to intimidate or threaten, but also for a cross burned at a public rally as "a statement of ideology" or "symbol of group solidarity." Id. at 364-67.

Similarly, in Elonis v. United States, the Court reasoned that criminal conduct requires "awareness of some wrongdoing," but interpreted a federal statute that prohibited transmitting "any threat to injure the person of another" through interstate commerce to include a knowing or purposeful mental state. 575 U.S. 723, 738-40 (2015). The Court expressly declined to address whether a mens rea of recklessness would suffice for a true threats prosecution under the First Amendment. Id. at 740-42.

The Supreme Court conclusively answered the question in Counterman, holding that a true threats prosecution "requires proof that the defendant had some subjective understanding of the threatening nature of his statements," but that a "specific intent to threaten the victim" is not required. 600 U.S. at 69, 73. Instead, a mental state of recklessness "is enough." Id. at 73.

Counterman reiterated that true threats of violence must be objectively threatening to a reasonable observer when taken in context. As the Court explained, the word "true" "distinguishes what is at issue from jests,

hyperbole, or other <u>statements that when taken in context do not convey a real possibility that violence will follow</u> (say, 'I am going to kill you for showing up late')." <u>Id.</u> at 74 (internal quotation marks omitted and emphasis added). In other words, a court must consider "what the statement conveys" to the victim before deciding if a threat is objectively "true." <u>Ibid.</u>

But the Court held that in addition to this objective component, the defendant must also have a subjective mental state in order for a true threats prosecution to comport with the First Amendment. <u>Id.</u> at 73. After reviewing the mens rea requirements for some other forms of historically unprotected speech -- recklessness for defamation and purpose or knowledge for incitement and obscenity -- the Court concluded that recklessness was the correct mens rea to require for true threats. <u>Id.</u> at 78-82.

The Court reasoned that it would make little sense to "offer greater insulation" to true threats of violence than to defamatory statements. <u>Id.</u> at 80. First, the societal interests in preventing threats of violence are at least as strong as the societal interests in preventing "truthful reputation-damaging statements about public officials." <u>Id.</u> at 80-81. Second, any "protected speech near the borderline" of a true threat of violence against another person

20

is "further from the First Amendment's central concerns" than protected speech approaching defamation of a public official.  Id. at 81.

Acknowledging that a mental state of purpose or knowledge is required for incitement, the Court held it is not necessary for true threats of violence.  Ibid.  The Court explained that although prosecutions for "incitement to disorder [are] commonly a hair's-breadth away from political 'advocacy' -- and particularly from strong protests against the government and prevailing social order," the same is not true for prosecutions for threatening actual violence against a specific person or group of people.  Ibid. (quoting Brandenburg v. Ohio, 395 U.S. 444, 447 (1969)).

2.

Article I, Paragraph 6 of the New Jersey Constitution provides that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right.  No law shall be passed to restrain or abridge the liberty of speech or of the press."

In setting forth "an affirmative right" to free speech, the first sentence of Article I, Paragraph 6 goes beyond the text of the First Amendment, and is "broader than practically all other[]" free speech clauses "in the nation." Green Party v. Hartz Mountain Indus., Inc., 164 N.J. 127, 145 (2000).

21

Although we often interpret Article I, Paragraph 6 as being "co-extensive with the First Amendment," and allow "federal constitutional principles [to] guide [our] analysis," E & J Equities, Ltd. Liab. Co. v. Bd. of Adjustment of Franklin, 226 N.J. 549, 568 (2016), in certain contexts we have held that our State Constitution's free speech clause provides "greater protection than the First Amendment." Mazdabrook Commons Homeowners' Ass'n v. Khan, 210 N.J. 482, 492 (2012).

## C.

Both the United States and the New Jersey Constitutions require jurors to reach a unanimous verdict in a criminal case. U.S. Const. amends. VI, XIV; N.J. Const. art. I, ¶ 9; see Ramos v. Louisiana, 590 U.S. ___, 140 S. Ct. 1390, 1397 (2020); State v. Parker, 124 N.J. 628, 633 (1991); see also R. 1:8-9. Unanimity generally requires that jurors "'be in substantial agreement as to just what a defendant did' before determining his or her guilt or innocence." State v. Frisby, 174 N.J. 583, 596 (2002) (quoting United States v. Gipson, 553 F.2d 453, 457 (5th Cir. 1977)). Jurors must unanimously agree that the defendant committed "every element of the crime with which he is charged, beyond a reasonable doubt"; however, they need not unanimously agree as to "which of several possible sets of underlying brute facts make up a particular

22

element, or which of several possible means the defendant used to commit an element of the crime." State v. Macchia, 253 N.J. 232, 252-53 (2023) (internal quotation marks and citations omitted).

IV.

A.

1.

We substantially adopt the Counterman standard and hold that in a criminal prosecution for a true threat of violence under N.J.S.A. 2C:12-3(a), a mens rea of recklessness suffices for purposes of both the First Amendment to the United States Constitution and Article I, Paragraph 6 of the New Jersey Constitution.

Under this standard, to be found guilty of a violation of N.J.S.A. 2C:12-3(a), a defendant must have consciously disregarded a substantial and unjustifiable risk that their threat to commit a crime of violence would terrorize another person, and that conscious disregard must be a gross deviation from the standard of conduct that a reasonable person in a defendant's situation would observe.

In the context of true threats, a mens rea of recklessness is demanding. As the Court explained in Counterman, "[i]n the threats context," a mens rea

23

of recklessness "means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" 600 U.S. at 79 (quoting Elonis, 575 U.S. at 746).  Although it is not purposeful or knowing, "recklessness is morally culpable conduct, involving a 'deliberate decision to endanger another.'"  Ibid. (quoting Voisine, 579 U.S. at 694).  Indeed, "reckless defendants have done more than make a bad mistake.  They have consciously accepted a substantial risk of inflicting serious harm."  Id. at 80.

This understanding of recklessness for purposes of a true threats prosecution is generally consistent with, although more specific than, the general definition of recklessness in the Criminal Code, set forth in N.J.S.A. 2C:2-2(b)(3):

> A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct.  The risk must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

But it requires more than the standard of recklessness conveyed in the judge's instructions to the jury in this case, which provided in part that "[o]ne

24

is said to act recklessly if one acts . . . <u>heedlessly, or foolhardily</u>." (emphasis added). That language, drawn from the relevant model charge, <u>see</u> <u>Model Jury Charges (Criminal)</u>, "Terroristic Threats (N.J.S.A. 2C:12-3(a))" (rev. Sept. 12, 2016), is not consistent with the standard we announce today.

With this understanding of recklessness as "morally culpable conduct" in the context of true threats, we agree that it is constitutionally sufficient for a prosecution of a threat of violence under N.J.S.A. 2C:12-3(a). We agree with <u>Counterman</u> that a mens rea of recklessness, so understood, correctly balances the need to avoid chilling protected speech with the need to protect individuals and society from the profound harms that threats of violence engender.

Like <u>Counterman</u>, we see no reason to "offer greater insulation" to true threats of violence than to true statements made about public figures. 600 U.S. at 80. And like <u>Counterman</u>, we decline to impose incitement's knowing or purposeful standard on true threats of violence under N.J.S.A. 2C:12-3(a). While the context for an incitement charge is often "political advocacy" that can easily "bleed over . . . to dissenting political speech at the First Amendment's core," <u>id.</u> at 81, that is not true for a threat of violence directed against a specific individual.

25

Defendant argues that a mens rea of recklessness could "fall short in prosecutions for abrasively criticizing officials in positions of power, who are often stand-ins for displeasure at the government" and "in prosecutions for civil rights advocacy, especially when such rallying for social change involves interactions with law enforcement officers, who are historically suspicious about the alleged threats posed by reform movement sympathizers." Therefore, at least in prosecutions for "dissenting political speech at the First Amendment's core," defendant contends, like his speech in this case, the State must be held to a "strong intent requirement." (quoting Counterman, 600 U.S. at 81).

We need not decide whether a different intent requirement should apply to prosecutions under N.J.S.A. 2C:12-3(a) for dissenting political speech, because no such speech was prosecuted here.

As earlier noted, N.J.S.A. 2C:12-3(a) makes a person guilty of a crime only "if he threatens to commit any crime of violence with the purpose to terrorize another . . . or in reckless disregard of the risk of causing such terror." It does not, on its face, criminalize political speech in the form of disparaging government officials, criticizing law enforcement, or even condemning the government itself.

And in this case, defendant was prosecuted for no such thing. He was prosecuted for threatening to shoot a police officer in the head.

Defendant claims that he was prosecuted because he "engaged in a heated debate with an officer . . . and then spoke critically to his Facebook followers, about his government's criminal justice policies." Further, defendant submits, he was "punish[ed]" because he "challenged [the] officers' policies and called for reform," while "protest[ing] against the government and [the] prevailing social order."

That is incorrect. At trial, the State argued that defendant was guilty of terroristic threats when he said, "[w]orry about a head shot, [epithet]." And the State urged that the threat to kill Officer Healey was given "weight," "immediacy," and "legitimacy" from defendant's April Facebook post that he still had his guns, and defendant's comment on Facebook, made less than three hours after the threat, "I KNO WHT YU DRIVE & WHERE ALL YU MOTHERFU$KERS LIVE AT[.]"

The State did not assert that defendant was guilty of violating N.J.S.A. 2C:12-3 because he told the police they were "causing too much chaos over here for nothing"; because he called Officer Healey "the f---ing devil"; or because he said that Officer Healey was "[a]lways trying to break somebody's

27

a--." Instead, the State repeatedly maintained that defendant was guilty of terroristic threats because he threatened to shoot Officer Healey in the head.

The same is true for defendant's Facebook posts. Defendant was not prosecuted for writing "I hope they burn freehold down!!!" or "im joinin ISIS. Lol." He was not prosecuted for posting that it was time to contact the Reverend Al Sharpton, the Reverend Jesse Jackson, Internal Affairs, or his lawyer. He was not prosecuted for berating the police for disrespecting his mother and trying to keep him in the system with petty fines and complaints. And he was not prosecuted for writing "YU WILL PAY, WHOEVA HAD ANY INVOLVEMENT. WASTIN TAX PAYERS MONEY! … SO SAD BUT WE WILL HAVE THA LAST LAUGH! #JUSTWAITONIT[.]" Defendant was prosecuted for threatening to shoot Officer Healey in the head, and then concretizing the threat mere hours later with the words "I KNO WHT YU DRIVE & WHERE ALL YU MOTHERFU$KERS LIVE AT[.]"

Quite simply, it is clear from the entirety of the trial that defendant was not prosecuted for "dissenting political speech." He was prosecuted for threatening to shoot a police officer in the head.

And defendant made this statement not at a political protest, march, demonstration, or rally, but when police responded to a domestic-violence call

28

at his home.  We therefore decline to consider whether a mens rea other than recklessness would be required if the State attempted to prosecute "dissenting political speech" as a true threat of violence under N.J.S.A. 2C:12-3(a).

We also disagree with defendant that <u>Watts</u> would have been decided differently under the recklessness standard we adopt today.  <u>Watts</u> did not turn on the defendant's subjective mens rea.  It turned on the objective component of a prosecution for true threats:  whether the defendant's words, taken in context, would be understood as threatening to a reasonable observer.  <u>Watts</u>, 394 U.S. at 708.  In holding that they would not, the United States Supreme Court looked at the "context" of the defendant's statement during a small-group discussion about police brutality at the Washington Monument, its conditional phrasing, and the reactions of others in the group (laughter), and concluded that the defendant's statement was "political hyperbole" and not a true threat.  <u>Ibid</u>.  <u>Watts</u> concluded that there was no true threat because the statement at issue was not objectively threatening; the defendant's subjective mens rea did not come into play.

2.

In addition to a subjective mens rea of at least recklessness, we hold that an objective component is necessary for a prosecution for a threat of violence

29

under N.J.S.A. 2C:12-3(a) to survive First Amendment and Article I, Paragraph 6 scrutiny.

On the objective element, we depart from Counterman and from the charge that the trial court provided to the jury in this case in one minor respect. The trial and appellate courts in Counterman had assessed the threat under "an objective reasonable person standard," requiring the State to prove "that a reasonable person would have viewed the . . . messages as threatening." Counterman, 600 U.S. at 71 (emphasis added) (internal quotation marks and citations omitted). And the trial court here charged the jury that the threat "must be of such a nature as to convey menace or fear of a crime of violence to the ordinary person. It is not a violation of this statute if the threat expresses fleeting anger or was made merely to alarm." (emphasis added).

But we have previously held that for a prosecution under N.J.S.A. 2C:12-3(b), which requires that a threat be made "under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out," proof "must be measured by an objective standard" that must include consideration of "a [victim's] individual circumstances and background." Cesare v. Cesare, 154 N.J. 394, 402-03 (1998) (emphasis added).

30

Similarly, in H.E.S. v. J.C.S., we explained that the "cause a reasonable person to fear" element in N.J.S.A. 2C:12-10(b), which criminalizes domestic-violence stalking, requires consideration of "whether a reasonable person in [the victim's] situation, knowing what [the victim knew about the defendant] under the totality of the circumstances, would have feared bodily injury as a result of [the defendant's] alleged speech and conduct." 175 N.J. 309, 330 (2003) (emphasis added). Our interpretation was in keeping with the Legislature's instruction in N.J.S.A. 2C:12-10(a)(4) that, "[a]s used in this act . . . '[c]ause a reasonable person to fear' means to cause fear which a reasonable victim, similarly situated, would have under the circumstances."

We therefore hold that the objective inquiry, in which the jury determines whether a reasonable person would have viewed the defendant's words as threatening violence, must be undertaken not from the perspective of an anonymous ordinary person, but from the perspective of a reasonable person similarly situated to the victim. As the Indiana Supreme Court has explained, because "the particular facts and circumstances known to each victim are the very facts from which threatening implications are generally drawn," the objective element of a true threats prosecution must consider "whether it was objectively reasonable for the victim to fear for their safety" in

31

the context of their experiences with the perpetrator. Brewington v. State, 7 N.E.3d 946, 969 (Ind. 2014) (requiring a "'reasonable victim' test," rather than a "reasonable person" test, in a true threats prosecution, to capture "what a reasonable person would perceive if similarly situated to the victim" (emphasis added)).

This is another way of saying that context matters. Considering the perspective of one similarly situated to the victim, which entails consideration of prior interactions between the parties, protects against convictions for statements made in jest, political dissent, or angry hyperbole, while allowing the State to prosecute true threats of violence that would instill fear of injury in a reasonable person in the victim's position. The inquiry in this case is thus not whether any ordinary person would have feared for their safety, but whether a reasonable police officer in Officer Healey's position would have feared for their safety, given the entire interaction with defendant.

3.

We thus remand for a new trial correctly charging the jury on both the objective and subjective components of N.J.S.A. 2C:12-3(a), consistent with this opinion.

32

We also ask the Model Criminal Jury Charges Committee to revise the model charge for N.J.S.A. 2C:12-3(a), both as to the subjective recklessness standard -- including by removing the terms "heedlessly" and "foolhardily" -- and the objective standard discussed herein.

B.

On remand, the court should additionally charge the jury that it must agree unanimously on whether defendant violated N.J.S.A. 2C:12-3(a), (b), or both.

The difference between an element of an offense and a means of committing an offense can be difficult to parse. The definition of "element" in the criminal code does not provide help: it defines "element" and "material element" to include different means or brute facts that would satisfy a single element of a crime. See N.J.S.A. 2C:1-14(h) ("'Element of an offense' means (1) such conduct or (2) such attendant circumstances . . . as (a) Is included in the description of the forbidden conduct in the definition of the offense; (b) Establishes the required kind of culpability . . . ."); N.J.S.A. 2C:1-14(i) ("'Material element of an offense' means an element that does not relate exclusively to the statute of limitations, jurisdiction, venue or to any other

33

matter similarly unconnected with (1) the harm or evil, incident to conduct, sought to be prevented by the law defining the offense . . . .").

As we explained in Macchia, if a statute required the use of a deadly weapon as a single element of a crime and provided that the element could be satisfied through use of a "'knife, gun, bat, or similar weapon,'" then the use of a knife, gun, bat, or other weapon would be different types of "conduct" that would be "included in the description of the forbidden conduct in the definition of the offense," and would "[e]stablish[] the required kind of culpability" -- making each fall within the statute's definition of "material element" in N.J.S.A. 2C:1-14(i). Macchia, 253 N.J. at 254 (quoting Mathis v. United States, 579 U.S. 500, 506 (2016) and N.J.S.A. 2C:1-14(h) and (i)). Yet the four weapons would undeniably be means of satisfying one single element of the crime: use of a deadly weapon.

Here, it suffices to note that the terroristic threats statute, N.J.S.A. 2C:12-3, "does not identify an individual element of which subsections [(a) and (b)] are mere examples," but rather "lists in the disjunctive [two] separately enumerated, alternative" crimes of terroristic threats. United States v. McCants, 952 F.3d 416, 426 (3d Cir. 2020) (analyzing N.J.S.A. 2C:15-1). That is clear from the plain text of the statute, which does not consist of one

section setting forth a crime of terroristic threats that can be satisfied through various alternative means, and instead sets forth two separate crimes of terroristic threats. See N.J.S.A. 2C:12-3 ("(a) A person is guilty of a crime of the third degree if he threatens to commit any crime of violence with the purpose to terrorize another . . . or in reckless disregard of the risk of causing such terror . . . . (b) A person is guilty of a crime of the third degree if he threatens to kill another with the purpose to put him in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of the threat and the likelihood that it will be carried out."). Given the structure of the statute, we conclude that a jury must unanimously agree as to whether a defendant is guilty of N.J.S.A. 2C:12-3(a), (b), or both, and must be so charged.

V.

The judgment of the Appellate Division is affirmed in part and reversed in part, and the matter is remanded to the trial court for further proceedings consistent with this opinion.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, SOLOMON, PIERRE-LOUIS, FASCIALE, and NORIEGA join in JUSTICE WAINER APTER's opinion.